**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| CURTIS BROWN, on behalf of himself and all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION** |
| | **DEMAND FOR JURY TRIAL** |
| v. | |
| COMCAST CABLE COMMUNICATIONS LLC and CITRIX SYSTEMS, INC.; | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff Curtis Brown (the "Plaintiff"), on behalf of himself and all others similarly situated, alleges the following Class Action Complaint (the "Action") against the above-captioned Defendants, Comcast Cable Communications LLC ("Comcast") and Citrix Systems, Inc. ("Citrix") (collectively, the "Defendants") upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel as follows:

## I.     NATURE OF THE ACTION

1.      Plaintiff brings this class action against Defendants for their failure to collectively secure and safeguard personally identifiable information ("PII") including but not limited to: Plaintiff's and Class members' name, contact information, partial Social Security numbers, dates of birth, and/or secret questions and answers for password resets.  Additionally, according to Comcast, Defendants are unsure if additional information was compromised as well.

1

2.      Comcast uses Citrix as a software provider.  Due to a critical vulnerability in Citrix software called CVE-2023-4966 (a/k/a "CitrixBleed"), Citrix's software was vulnerable to cyberattacks by hackers who knew how to exploit that vulnerability.  CitrixBleed was disclosed to Citrix's software clients (including Comcast) on October 10, 2023 with an accompanying "patch," which is a software mechanism to resolve a specific vulnerability.  However, Comcast waited at least six to nine days to address the vulnerability; and, by the time Comcast applied the patch for CitrixBleed – it was too late.  The PII of nearly 36,000,000 customers was compromised due to Comcast's failure to mitigate CitrixBleed and due to Citrix for not catching the vulnerability before it was accessible by cybercriminals (the "Data Breach").

3.      Comcast, as a substantial telecommunications and cable provider, and Citrix, as a substantial technology services company, both have the resources to take seriously the obligation to protect private information.  However, Defendants failed to invest the time or resources necessary to protect the PII of Plaintiff and Class members.

4.      According to the Notice of Data Security Incident (the "Notice") filed by Comcast with the Maine Attorney General, in relevant part:

**What Happened?**  On October 10, 2023, one of [Comcast's] software providers, Citrix, announced a vulnerability in one of its products used by [Comcast] and thousands of companies worldwide.  At the time Citrix made this announcement, it released a patch to fix the vulnerability.  Citrix issued additional mitigation guidance on October 23, 2023.  We promptly patched and mitigated our systems.

However, we subsequently discovered that prior to mitigation, between October 16 and October 19, 2023, there was unauthorized access to some of our internal systems that we concluded was a result of this vulnerability… On November 16, 2023 it was determined that information was likely acquired.

5.      There are numerous concerning points about this Notice.  First, and contrary to the Notice, Comcast did not "promptly patch and mitigate" its systems: it waited just long enough for the CitrixBleed vulnerability to be exploited with devastating effects to Plaintiff and Class

members.  Next, according to the Notice, it was not determined until November 16, 2023 that PII was compromised; this means that Comcast failed to know where PII was maintained in their systems and who had access to that PII for nearly a month after CitrixBleed was first disclosed and that Comcast failed to disclose the Data Breach for an additional month after it occurred.  Finally, the Notice offers victims no form of identity theft or credit monitoring services whatsoever.  In an age ripe with data security incidents, this is the bare minimum that other companies offer when they make such a critical mistake.  And yet, Comcast's Notice offers no credit monitoring, identity theft protection, or data breach insurance (which are the bare minimum that Comcast could offer) for the victims.  Citrix did not send out any notification at all, let alone offer anything for the victims.

6.     The actions of Defendants as related to this Data Breach are unconscionable.  Upon information and belief, Comcast (as well as thousands of other companies) negligently chose and entrusted Citrix's software which contained vulnerabilities to exploitations like CitrixBleed. Comcast also failed to implement the CitrixBleed vulnerability patch in a timely manner, which resulted in the Data Breach.  With respect to Citrix, Citrix failed to make a software that was free of the critical vulnerabilities as alleged herein.  Researchers estimate that CitrixBleed has been actively exploiting Citrix software since at least August 2023; and yet, Citrix failed to notify their customers until October 2023, nearly two months later.  As a result of this behavior and these failures, Plaintiff and Class members face a litany of harms that come with data breaches of this magnitude and severity.

7.     As such, Plaintiff, on behalf of herself and all others similarly situated, brings this Action for restitution, actual damages, nominal damages, statutory damages, injunctive relief, disgorgement of profits and all other relief that this Court deems just and proper.

## II.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).   The amount of controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are more than 100 putative Class members, and minimal diversity exists because one or more putative Class members are citizens of a different state than Defendant.

9.    This Court has personal jurisdiction over Citrix because Citrix maintains its principal place of business in Fort Lauderdale, Florida. Furthermore, Defendant intentionally availed itself of this jurisdiction by marketing, employing individuals, and providing financial services in Florida.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Citrix operates in this District and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

## III.    PARTIES

### *Plaintiff*

11.    Plaintiff Curtis Brown is, and at all times mentioned herein, was an individual citizen of the state of Illinois.  Plaintiff was a Comcast Xfinity customer who received a Notice from Comcast in December of 2023 via email.

### *Defendant Comcast Cable Communications LLC*

12.    Defendant Comcast Cable Communications LLC is headquartered in Philadelphia, Pennsylvania.  Comcast offers telecommunication and cable services to consumers across the United States.

### *Defendant Citrix Systems, Inc.*

13.     Defendant Citrix Systems, Inc. is headquartered in Fort Lauderdale, Florida.  Citrix offers software and data solutions to consumer-facing companies globally, including in the United States.

## IV.     FACTUAL ALLEGATIONS

### A.  *Defendant's Businesses and Collection of Private Information*

14.     In the course of doing business, Comcast acquires a significant amount of highly sensitive and valuable private information from its customers, including the acquisition of the PII of Plaintiff and Class members.

15.     According to the Notice, Comcast hired Citrix as a software provider in order to obtain software that would maintain Comcast's customer data.  In the process of doing this, Citrix acquired a significant amount of Comcast customers' private information, including the PII of Plaintiff and Class members.

16.     As a condition of receiving this PII, Plaintiff and Class members entrusted that Comcast would only use their data for business purposes in a way that was safe and secure, and that includes and extends to the hiring and oversight of third parties contracted to provide services on behalf of Comcast.

17.     Comcast's Xfinity product maintains a privacy policy (the "Privacy Policy") which states, "You are in control of your data… We share personal information with others when it is needed to provide you with our Services… We also share personal information with others: when you direct us to do so… when required by law… and to protect our property or the rights or the safety of our employees, our customers, and other individuals."

18.     By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class members' PII, Defendants assumed legal and equitable duties and knew or should have known

that each were responsible for ensuring the safety and security of Plaintiff and Class members' PII to protect it from unauthorized disclosure and exfiltration.

19.     Plaintiff and Class members relied on Comcast (and, therefore, on Citrix) to keep their PII confidential and only to make authorized disclosures of this PII, which Defendants failed to do.

### B.  CitrixBleed and The Data Breach

20.     On or about December 19, 2023, Comcast posted the following Notice on their website and filed the same notice with multiple states attorneys general:

> **Notice of Data Security Incident**
> We are notifying you of a recent data security incident involving your personal information. This notice explains the incident, steps Xfinity has taken to address it, and guidance on what you can do to protect your personal information.
>
> **What Happened?** On October 10, 2023, one of Xfinity's software providers, Citrix, announced a vulnerability in one of its products used by Xfinity and thousands of other companies worldwide. At the time Citrix made this announcement, it released a patch to fix the vulnerability. Citrix issued additional mitigation guidance on October 23, 2023. We promptly patched and mitigated our systems.
>
> However, we subsequently discovered that prior to mitigation, between October 16 and October 19, 2023, there was unauthorized access to some of our internal systems that we concluded was a result of this vulnerability. We notified federal law enforcement and conducted an investigation into the nature and scope of the incident. On November 16, 2023, it was determined that information was likely acquired.
>
> **What Information Was Involved?** On December 6, 2023, we concluded that the information included usernames and hashed passwords. For some customers, other information was also included, such as names, contact information, last four digits of social security numbers, dates of birth and/or secret questions and answers. However, our data analysis is continuing, and we will provide additional notices as appropriate.
>
> **What We Are Doing.** To protect your account, we have proactively asked you to reset your password. The next time you login to your Xfinity account, you will be prompted to change your password, if you haven't been asked to do so already.
>
> **What You Can Do**. We strongly encourage you to enroll in two-factor or multi-factor authentication. While we advise customers not to re-use passwords across multiple accounts, if you do use the same information elsewhere, we recommend that you change the information on those other accounts, as well. You can review the "Additional Information" section below for information on how you can further protect your personal information.

21.     Not only do the Class members have to contend with the harms caused by the Data Breach, but Defendants' individual responses have been woefully insufficient.

22.     Comcast did not "promptly patch and mitigate" its systems: it waited just long enough for the CitrixBleed vulnerability to be exploited with devastating effects to Plaintiff and Class members.  According to the Notice, it was not determined until November 16, 2023 that PII was compromised; this means that Comcast failed to know where PII was maintained in their systems and who had access to that PII for nearly a month after CitrixBleed was first disclosed and that Comcast failed to disclose the Data Breach for an additional month after it occurred.  Worst of all, the Notice offers victims no form of identity theft or credit monitoring services.  This is the bare minimum that other companies offer when they make such a critical mistake.  And yet, Comcast's Notice offers no credit monitoring, identity theft protection, or data breach insurance (which are the bare minimum that Comcast could offer) for the victims.  Citrix did not send out any notification at all, let alone offer anything for the victims.

23.     On information and belief, the PII compromised in the files accessed by hackers was not encrypted.  This can also be inferred given that the hackers were able to access the data that was listed as compromised in the Notice of Data Breach.

24.     Moreover, the removal of PII from Comcast's systems demonstrates that this cyberattack was targeted due to Comcast's status as a premier telecommunications and cable services facility that houses sensitive PII.  And, armed with this PII, data thieves (as well as downstream purchasers of the stolen PII), can commit a variety of crimes, including: opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using

Class members' tax identification information, obtaining driver's licenses in Class members' names but with a different photograph, and giving false information to police during an arrest.

25.     Due to Comcast's flawed security measures, flawed oversight of third-party vendors and incompetent response to the Data Breach, Plaintiff and the Class members now face a present, substantial, and imminent risk of fraud and identity theft and must deal with that threat forever.

26.     Despite widespread knowledge of the dangers of identity theft and fraud associated with cyberattacks and unauthorized disclosure of PII, and despite Defendants' generous operating budgets, Defendants provided unreasonably deficient protections prior to the Data Breach, including but not limited to a lack of security measures for storing and handling PII, as well as inadequate employee training regarding how to access, oversee the protection, handle and safeguard for this sensitive set of information.

27.     Comcast failed to adequately adopt and train its employees and third-parties on even the most basic of information security protocols, including storing, locking, encrypting and limiting access to current and former consumers and employees' highly sensitive PII; implementing guidelines for accessing, maintaining, and communicating sensitive PII; and protecting sensitive PII by implementing protocols on how to utilize such information.

28.     Defendants' failures caused the unpermitted disclosure of Plaintiff's and Class members' PII to an unauthorized third-party cybercriminal and put Plaintiff and Class members at serious, immediate, and continuous risk of identity theft and fraud.

29.     The Data Breach that exposed Plaintiff's and Class members' PII was caused by Defendants' violation of their obligations to abide by best practices and industry standards concerning its information security practices and processes.

30.     Defendants, despite being technologically advanced organizations, failed to comply with basic security standards or to implement security measures that could have prevented or mitigated the Data Breach.

31.     Comcast failed to ensure that all personnel with access to its current/former consumers' PII were properly trained in retrieving, handling, using and distributing sensitive information.  This means that personnel are trained to apply relevant updates and software patches, as Comcast should have here.  Further, there have been no assurances offered by Comcast that all personal data or copies of the PII at issue were either recovered, destroyed, or otherwise protected by an enhanced data security protection apparatus.

### C.  The Data Breach Was Foreseeable

32.     Defendants have weighty obligations created by industry standards, common law, and its own promises and representations to keep PII confidential and to protect from unauthorized access and disclosure.

33.     Plaintiff and Class members provided their PII to Comcast with the reasonable expectation and mutual understanding that Comcast would comply with its obligations to keep such information confidential and secure from unauthorized access.  This expectation and mutual understanding extended to software providers, like Citrix, that Comcast uses for business purposes.

34.     Comcast's data security obligations were particularly acute given the substantial increase in ransomware attacks and/or data breaches in various industries (especially including the financial services industry) preceding the date of the Data Breach.

35.     Comcast was aware of the risk of data breaches because such breaches have dominated the headlines in recent years.

36.    Furthermore, the Data Breach was foreseeable because Comcast was made aware and knew (or should have known) about CitrixBleed due to the attention and publicity it was receiving prior to the Data Breach occurring.  For example, the United States cybersecurity agency run by the Department of Homeland Security, CISA, sent out agency alerts about CitrixBleed. CISA stated:

> CISA and our partners are responding to active, targeted exploitation of a vulnerability, CVE-2023-4966, affecting Citrix NetScaler ADC and NetScaler Gateway. The vulnerability is also known as CitrixBleed. The affected products contain a buffer overflow vulnerability that allows for sensitive information disclosure when configured as a Gateway (VPN virtual server, ICA Proxy, CVPN, RDP Proxy) or AAA virtual server. Customers using Citrix-managed cloud services or Citrix-managed Adaptive Authentication are not impacted.
>
> Exploitation of this vulnerability could allow for the disclosure of sensitive information, including session authentication token information that may allow a threat actor to "hijack" a user's session.

37.    Additionally, other major companies across the United States and globally suffered data breaches due to CitrixBleed, evidencing the impact the exploitation could have if not treated properly.  Some of these companies include Boeing, Toyota, DP World, the Industrial and Commercial Bank of China, and Allen & Overy.  According to the Notice, thousands of Citrix's customers are potentially vulnerable to CitrixBleed; meaning, there could be tens of millions of more downstream-consumer victims who will be harmed by the CitrixBleed exploitation (and/or the failure by Citrix's customers, like Comcast, to patch it).

38.    Other consumer-facing industries have wisely heeded the warning.  For example, the American Hospital Association (the "AHA") released an alert to its members on December 1, 2023 letting them know about the necessity of patching the CitrixBleed vulnerability as well as

pointing them to government guidance released by the Department of Health and Human Services. John Riggi, the AHA's national advisor for cybersecurity and risk stated, "[t]his urgent warning by [the Department of Health and Human Services] signifies the seriousness to the CitrixBleed vulnerability and the urgent need to deploy the existing Citrix patches and upgrades to secure our systems… We must remain vigilant and harden our cyber defenses, as there is no doubt that cybercriminals will continue to target the field…"

39.     PII, like the PII targeted by the hackers in this Action using the CitrixBleed vulnerability, is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used in a variety of unlawful manners.  PII can be used to distinguish, identify or trace an individual's identity.  This can be accomplished alone or in combination with other personal or identifying information that is connected or linked to an individual, such as the information compromised in the Data Breach.

40.     Given the nature of the Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of different ways.

41.     Cybercriminals who possess the Class members' PII can readily obtain Class members' tax returns or open fraudulent credit card or other types of accounts in the Class members' names.

42.     The increase in such attacks, and attendant risk of future attacks, was widely known.

43.     As such, this specific Data Breach was foreseeable.  Defendants were cognizant of data breaches because of how common and high-profile data breaches have become with respect to consumer-facing businesses, such as Comcast.

### D.  Defendant Failed to Follow FTC Guidelines and Industry Standards

44.     Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the data which they collect and maintain.  The reason this data is so valuable is because it contains PII, which can be sold and weaponized for purposes of committing various identity theft-related crimes.  It is well-known that, because of the value of this data and PII, businesses that collect, store, maintain, and otherwise utilize or profit from PII must take necessary cybersecurity safeguards to ensure that the data they possess is adequately protected.

45.     Government agencies also highlight the importance of cybersecurity practices.  For example, the Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

46.     According to the FTC, the need for data security should be factored into all business decision-making.

47.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

48.     The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

49.     The guidelines also recommend that businesses use an intrusion detection system to detect and expose a breach as soon as it occurs; monitor all incoming traffic for activity

indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

50.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

51.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, in some cases treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.  Orders resulting from these actions further explicate and clarify the measures businesses must take to meet their data security obligations.

52.    Defendants failed to properly implement some or all of these (and other) basic data security practices.

53.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

54.    Defendants at all times were fully aware of obligations to protect PII.  Defendants were also keenly aware of the significant repercussions that would result from the failure to do so.

55.    Experts studying cyber security routinely identify consumer-facing businesses as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

56.     Several best practices have been identified that, at a minimum, should be implemented by consumer-facing businesses such as Comcast (and its third party vendors, such as Citrix), include but are not limited to: educating all employees about cyber security; requiring strong passwords; maintaining multi-layer security, including firewalls, anti-virus, and anti-malware software; utilizing encryption; making data unreadable without a key; implementing multi-factor authentication; backing up data; and limiting which particular employees can access sensitive data.

57.     Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; and training staff regarding critical points.

58.     These foregoing frameworks are existing and applicable industry standards. Comcast and Citrix failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### E.  Defendants' Breaches of Its Obligations

59.     Defendants breached their obligations to Plaintiff and Class members and were otherwise negligent and/or reckless because: each Defendant failed to properly maintain, oversee and safeguard its computer systems, network and data.  In addition to its obligations under federal and state law, Defendants owed a duty to Plaintiff and the Class members to exercise reasonable care when obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed or misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class members to provide reasonable security, including

complying with industry standards and requirements, training for its staff and ensuring that their collective computer systems, networks, and protocols adequately protected the PII of Plaintiff and the Class members.

60.     Defendants wrongful conduct includes, but is not limited to, the following acts and/or omissions:

a.   Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.   Failing to adequately protect current or former consumers' PII;

c.   Failing to implement updates and patches in a timely manner;

d.   Failing to properly monitor third-party data security systems for existing intrusions, brute-force attempts and clearing of event logs;

e.   Failing to ensure that all employees and third-parties apply all available and necessary security updates;

f.   Failing to ensure that all employees and third-parties install the latest software patches, update its firewalls, check user account privileges, or ensure proper security practices;

g.   Failing to ensure that all employees and third-parties practice the principle of least-privilege and maintain credential hygiene; and failing to avoid the use of domain-wide, admin-level service accounts;

h.   Failing to adequately oversee employees and third-party vendors;

i.   Failing to ensure that all employees and third-parties employ or enforce the use of strong randomized, just-in-time local administrator passwords; and

j.   Failing to properly train and supervise employees and third-parties in the proper handling of inbound emails.

61.     As the result of allowing its computer systems to fall into dire need of security upgrading and its inadequate procedures for handling cybersecurity threats, Defendants negligently and wrongfully failed to safeguard Plaintiff's and Class members' PII.

62.     Accordingly, as further detailed herein, Plaintiff and Class members now face a substantial, increased, and immediate risk of fraud, identity theft, and the disclosure of their most sensitive and deeply personal information.

### F.  Data Breaches Are Harmful and Disruptive

63.     The United States Government Accountability Office ("GAO") released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

64.     That is because all victims of a data breach may be exposed to serious ramifications regardless of the nature of the data.  Indeed, the reason criminals steal PII is to monetize it because there is (unfortunately) a market for personally identifiable information, like the PII compromised by the Data Breach.

65.     Cybercriminals do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities in order to engage in illegal financial transactions under the victims' names.  Because a person's identity is akin to a puzzle, the more accurate individual pieces of data an identity thief obtains regarding a person, the easier it is for that thief to take on the victim's identity, or otherwise harass or track the victim.

66.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information regarding a victim's identity, such as a person's login credentials or Social Security number.   Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

67.     The type of information compromised in this Data Breach is even worse than merely a name and date of birth.  A stolen Social Security number is a skeleton key to the victim's identity – and, therefore, the type of data that cyberthieves seek.  Identity thieves can use a Social Security number for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, fraudulently obtaining a job, fraudulently renting a house, or filing a false police report.

68.     Because of the threat of these harms, the FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and potentially obtaining an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

69.     Theft of PII is gravely serious.  PII is an extremely valuable property right.

70.     Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences.  Even this obvious risk to reward analysis illustrates that PII has considerable market value.

71.     According to the GAO:

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen

data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

72.     Private information, such as the PII compromised herein, is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.  The private information of consumers remains of high value to criminals, as evidenced by the prices paid through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.  For example, private information (inclusive of a Social Security number) can be sold at a price from $40 to $200, and bank details have a price range of $50 to $200.  Experian reports that a stolen credit card or debit card number can sell between $5 to $110 on the dark web.  Clearly, all this data has real value – which is why it was targeted and stolen in the first place.

73.     Because of the value of the PII compromised in the Data Breach, there is a strong probability that entire batches of information stolen in the Data Breach have been dumped on the black market, as that is the *modus operandi* of cybercriminals who perpetrate data breaches, while other batches have yet to be dumped on the black market, meaning Plaintiff and Class members are at a substantial imminent risk of injury including an increased risk of fraud and identity theft for many years into the future.

74.     Thus, Plaintiff and Class members must vigilantly monitor their financial accounts and other indices of identity theft (*i.e.*, the mail, email, etc.) for many years to come.

### G.  *Harm to Plaintiff and the Class*

75.     On or about December 19, 2023, Plaintiff received notice from Comcast that his PII had been improperly accessed and/or obtained by unauthorized third parties.  This notice

indicated that Plaintiff's PII was compromised as a result of the Data Breach. Plaintiff still has not heard from Citrix about the Data Breach.

76.     As a result of being informed about the Data Breach, Plaintiff has commenced making reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing reports and his financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff has already spent multiple hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

77.     Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) actual misuse of his compromised PII; (b) damage to and diminution in the value of his PII, a form of property that Defendant obtained from Plaintiff; (c) violation of his privacy, including the compromise of highly sensitive PII such as, for example, his Social Security numbers in combination with name and other private information; (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud; and (e) actual and potential out-of-pocket losses including the loss of time, as Plaintiff has spent multiple hours dealing with the repercussions of the Data Breach, due to time spent mitigating the actual and potential harms caused by the Data Breach.

## V.     CLASS ALLEGATIONS

78.     Plaintiff brings this nationwide class on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure. The "Class" that the Plaintiff seeks to represent is defined as follows:

> **Class Definition.**  All persons whose PII was maintained by Citrix and/or Comcast which was compromised in the Data Breach.

79.     Excluded from the Class are Defendants and Defendants' subsidiaries, affiliates, officers and directors, and any entity in which the Defendants have a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

80.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

81.     **Numerosity**.  Comcast reports to the Maine Attorney General that the Data Breach compromised PII of nearly 36 million current consumers.  Therefore, the members of the Class are so numerous that joinder of all members is impractical.

82.     **Commonality**.  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.   These common questions of law and fact include, without limitation:

a. Whether Defendants unlawfully used, maintained, lost or disclosed Plaintiff's and Class members' PII;

b. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendants data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendants owed a duty to Plaintiff and Class members to safeguard their PII;

f. Whether Defendants breached their duties to Plaintiff and Class members to safeguard their PII;

g. Whether computer hackers obtained Plaintiff's and Class members' PII in the Data Breach;

h. Whether Defendants knew or should have known that their (and its third-party software vendors') data security systems and monitoring processes were deficient;

i. Whether Plaintiff and Class members suffered legally cognizable damages as a result of Defendants' misconduct;

j. Whether Defendants' acts, inactions, and practices complained of herein amount to a breach of contract, and/or common law negligence, and whether Defendants have been unjustly enriched;

k. Whether Defendants failed to provide notice of the Data Breach in a timely and proper manner; and

l. Whether Plaintiff and Class members are entitled to damages, civil penalties, punitive damages, equitable relief and/or injunctive relief.

83.     **Typicality**.  Plaintiff's claims are typical of those of other Class members because Plaintiff's PII, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiff, like all Class members, was injured by Defendants' uniform conduct.  Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff.  The claims of Plaintiff and those of other Class members arise from the same operative facts and are based on the same legal theories.

84.     **Adequacy of Representation**.  Plaintiff will fairly and adequately represent and protect the interests of the Class in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights Plaintiff suffered are typical of the other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiff has retained counsel experienced in complex class action litigation, including, but not limited to, data privacy class action litigation, and Plaintiff intends to prosecute this action vigorously.

85.     **Superiority of Class Action**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual

lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based upon an identical set of facts.  Without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

86.     The litigation of the claims brought herein is manageable.  Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

87.     Adequate notice can be given to Class members directly using information maintained in Defendants' records.

88.     **Predominance**.  The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Defendants have engaged in a common course of conduct toward Plaintiff and Class members.  The common issues arising from Defendants' conduct affecting Class members set out above predominate over any individualized issues.  Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

89.     This proposed class action does not present any unique management difficulties.

## COUNT I

### NEGLIGENCE

90.     Plaintiff and the Class repeat and re-allege each and every allegation as if fully set forth herein.

91.     Comcast knowingly collected, acquired, stored, and/or maintained Plaintiff's and Class members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting the PII from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

92.     The duty included obligations to take reasonable steps to prevent disclosure of the PII, and to safeguard the information from theft.  Comcast's duties included the responsibility to design, implement, and monitor its and its data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach, as well as to implement security patches from third party vendors like Citrix.  Citrix' duties included the responsibility to design and implement software which was not vulnerable to attack, as its software was vulnerable to CitrixBleed as alleged herein.

93.     Defendants owed a duty of care to Plaintiff and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, policies, and procedures, and the personnel responsible for them, adequately protected PII.

94.     Defendants owed a duty of care to safeguard the PII due to the foreseeable risk of a data breach and the severe consequences that would result from their failure to so safeguard PII.

95.     Defendants' duty of care to use (and to ensure that its third-party vendors used) reasonable security measures arose as a result of the special relationship that existed between Defendants and those individuals who entrusted them with their PII, which is recognized by laws and regulations including but not limited the FTCA as well as common law.  Defendants were in a position to ensure that its vendor's systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

96.     In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

97.     Defendants' duty to use reasonable care in protecting PII arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect PII that they either acquire, maintain, or store.

98.     Defendants breached their duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII, as alleged and discussed above.

99.     It was foreseeable that Defendants' failure to use reasonable measures to protect Class members' PII would result in injury to Plaintiff and Class members.  Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the consumer-facing industries that they engage in.

100.    It was therefore foreseeable that the failure to adequately safeguard Class members' PII would result in one or more types of injuries to Class members.

101.    The imposition of a duty of care on Defendants to safeguard the PII they maintained, transferred, stored or otherwise used is appropriate because any social utility of Defendants' conduct is outweighed by the injuries suffered by Plaintiff and Class members as a result of the Data Breach.

102.    As a direct and proximate result of Defendants' individual and collective negligence, Plaintiff and Class members are at a current and ongoing imminent risk of identity theft, and Plaintiff and Class members sustained compensatory damages including: (i) invasion of privacy; (ii) financial "out of pocket" costs incurred mitigating the materialized risk and imminent

threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iv) financial "out of pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their PII; (viii) future costs of identity theft monitoring; (ix) anxiety, annoyance and nuisance, and (x) the continued risk to PII, which remains in Defendants' and the third-party's respective control, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class members' PII.

103.    Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

104.    Comcast's negligent conduct is ongoing, in that Comcast still holds the PII of Plaintiff and Class Members in an unsafe and unsecure manner.

105.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT II

### BREACH OF IMPLIED CONTRACT

106.    Plaintiff realleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

107.    Defendants provide services to Plaintiff and Class members.  Defendants each formed an implied contract with Plaintiff and Class members through their conduct.

108.    Through Defendants' individual provision of services, they knew or should have

known that they must protect Plaintiff's and Class members' confidential PII in accordance with Defendants' stated policies, practices and the applicable law.

109.    As consideration, Plaintiff and Class members turned over valuable PII in exchange for telecommunications or cable services.

110.    Defendants accepted possession of Plaintiff's and Class members' PII for the purpose of providing services to Plaintiff and the Class members.  In delivering their PII to Defendants, Plaintiff and the Class members intended and understood that Defendants would adequately safeguard the PII as part of the provision or receipt of those services.

111.    Defendants' implied promises to Plaintiff and Class members include, but are not limited to: (1) taking steps to ensure that anyone who is granted access to PII also protects the confidentiality of that data; (2) taking steps to ensure that the PII placed in control of Defendants' employees is restricted and limited only to achieve authorized business purposes; (3) restricting access to employees and/or agents who are qualified and trained; (4) designing and implementing appropriate retention policies to protect PII; (5) applying or requiring proper encryption and/or the separation of different data sets; (6) implementing multifactor authentication for access; and (7) taking other steps to protected against foreseeable breaches.

112.    Plaintiff and Class members would not have entrusted their PII to Defendants in the absence of such an implied contract.

113.    Defendants violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class members' PII.

114.    Plaintiff and Class members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein. Plaintiff seeks damages, including restitution, actual damages, nominal damages, and any other

awardable form of damages, in an amount to be proven at trial.

## COUNT III

### UNJUST ENRICHMENT

115.    Plaintiff realleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

116.    This count is asserted in the alternative to breach of implied contract (Count II).

117.    Plaintiff and Class members conferred a benefit on Defendants with their money and data.  Specifically, they purchased services from Comcast and, in so doing, also provided Defendants with their PII. In exchange, Plaintiff and Class members should have received from Defendants the services that were the subject of the transaction and should have had their PII  been protected with adequate data security.

118.    Defendants knew that Plaintiff and Class members conferred a benefit which Defendants accepted.  Defendants profited from these transactions and used the PII of Plaintiff and Class members for business purposes.

119.    In particular, Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff and Class members' PII. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures.  Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite security.

120.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class members, because Defendants failed

to implement appropriate data management and security measures that are mandated by industry standards.

121.    Defendants failed to secure Plaintiff's and Class members' PII and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

122.    Defendants acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

123.    Had Plaintiff and Class members known that Defendants had not reasonably secured their PII, they would not have agreed to provide their PII to Defendants.

124.    Plaintiff and Class members have no adequate remedy at law.

125.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their PII is used; (c) the compromise, publication, and/or theft of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect PII in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members.

126.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm.

127.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that it unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Comcast's services.

## VI.    PRAYER FOR RELIEF

128.    WHEREFORE, Plaintiff, on his own behalf and on behalf of all others similarly situated, prays for relief as follows:

A.    For an Order certifying this case as a class action and appointing Plaintiff and his counsel to represent the Class;

B.    For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

C.    For injunctive and other equitable relief to ensure the protection of the sensitive information of Plaintiff and the Class which remains in Defendant's possession;

D.    For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

E.    Pre- and post-judgment interest on any amounts awarded; and

F.    Such other and further relief as the Court may deem just and proper.

## VII.    JURY TRIAL DEMAND

129.    Plaintiff hereby demands a trial by jury on all claims so triable.

DATED: December 21, 2023                    Respectfully submitted,

_/s/ Richard C. Wolfe_____
Richard C. Wolfe

Mason R. Wolfe
(pro hac vice forthcoming)
**WOLFE LAW MIAMI**
175 SW 7th Street
Penthouse 2410
Miami, Florida 33130
Tel.: 855-573-2702


Israel David
(pro hac vice forthcoming)
*israel.david@davidllc.com*
Blake Hunter Yagman
(pro hac vice forthcoming)
*blake.yagman@davidllc.com*
**ISRAEL DAVID LLC**
17 State Street, Suite 4010
New York, New York 10004
Telephone: (212) 739-0622

*Attorneys for Plaintiff and the Proposed Class*